**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW SCHWARTZ, and ALICE VITIELLO, Individually and on Behalf of All Others Similarly Situated, )))) | Case No.: |
| ) | |
| Plaintiff, )) | |
| ) | **JURY TRIAL DEMANDED** |
| v. ) | |
| ) | |
| FAIRLIFE, LLC. )) | |
| Defendants. ))) | |

## CLASS ACTION COMPLAINT

Plaintiffs Andrew Schwartz and Alice Vitiello ("Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge as to facts pertaining to themselves and on information and belief as to all other matters, by and through their undersigned counsel, bring this class action complaint against Defendant Fairlife, LLC, ("Defendant" or "Fairlife").

## NATURE OF THE ACTION

1.     This consumer class action arises out of Defendant's deceptive marketing practices in connection with its sale of Fairlife milk products throughout the United States. While Fairlife prominently and repeatedly states the high degree of care with which its supply cows are treated, in fact, Fairlife's "flagship farm" routinely abuses and mistreats its cows. Fairlife charges a sizeable premium for its product on store shelves, which is partly due to the fact that consumers are willing to pay more to purchase foods that they believe are grown or raised humanely.

1

2.      Earlier this month, Animal Recovery Mission, a not-for-profit animal welfare organization out of Miami Beach, Florida, posted an exposé online detailing myriad instances of animal cruelty observed toward calves and cows at Fair Oaks Farms, the "flagship farm" of the Fairlife brand.[1]

3.      Animal Recovery Mission observed employees throwing, slapping, and kicking calves and took video recordings of the conduct witnessed.  Animal Recovery Mission further witnessed young calves being starved to death, beaten with steel bars, and burned with branding irons.  In addition, Animal Recovery Mission also witnessed grown cows who could no longer produce milk being shot and left to die, a process that sometimes took several hours.  This and other conduct was released to the public in video and in a written report on June 4, 2019.

4.      Fairlife states extensively and repeatedly, both on its website and on its products, that its cows are treated with "the utmost care" and with "[e]xtraordinary care and comfort."[2] This marketing forms a core part of Fairlife's representations regarding its milk, and Fairlife charges a premium for its milk products as a result.

5.      Nonetheless, Fair Oaks Farms has admitted that the practices witnessed by the investigator from the Animal Recovery Mission occurred and the owner of Fair Oaks Farms, Mike McCloskey (who is himself a part-owner of Fairlife), says that he takes "full responsibility" for the practices at issue.[3]

6.      Accordingly, Plaintiffs bring this action on behalf of themselves and all other similarly situated consumers to recover the amounts Plaintiffs and the other Class members

---

[1] https://www.foxnews.com/us/authorities-investigate-alleged-animal-abuse-at-famous-farm, last accessed June 6, 2019.
[2] https://fairlife.com/our-promise/, last accessed June 6, 2019.
[3] https://www.chicagotribune.com/business/ct-biz-fair-oaks-farms-alleged-animal-abuse-20190605-story.html, last accessed June 6, 2019.

overpaid, to prevent Defendant from continuing to engage in its unlawful, deceptive, and unfair conduct, and to correct the false perception it has created in the marketplace through its misrepresentations of material facts.

7.      While Plaintiffs are not aware of when such unlawful, deceptive, and unfair conduct began or ceased (or even if it has truly ceased), according to the Animal Recovery Mission Report, it began no later than August 2018 and continued through no earlier than November 2018.  This period of unlawful, deceptive, and unfair conduct is referred to as "the Class Period."

## JURISDICTION AND VENUE

8.      The Court has original subject matter jurisdiction over the case under 28 U.S.C. § 1332(d) because the case is brought as a class action under Fed. R. Civ. P. 23, at least one proposed Class member is of diverse citizenship from Defendant, the proposed Class includes more than 100 members, and the aggregate amount in controversy exceeds five million dollars, excluding interest and costs.

9.      Venue is proper in this District under 28 U.S.C. § 1391 because Defendant engaged in substantial conduct relevant to Plaintiff's claims within this District, has its principal place of business in this District, and has caused harm to Class members residing within this District.

## PARTIES

10.     Plaintiff Andrew Schwartz is a citizen of the State of Illinois, residing in Homewood, Illinois.  For the last two years, Schwartz has purchased approximately two 52-ounce bottles of Fairlife's Chocolate 2% Reduced Fat Milk per month from his local grocery stores, including Target, Fresh Farms, Cermak Produce, Valli Produce, and Pete's Fresh Market.

3

Schwartz read and relied on Fairlife's statements regarding its humane treatment of its supply cows in choosing to purchase Fairlfe's milk products. Had Schwartz known of Fairlife's deceptive and misleading practices, he would not have bought Fairlife's products, or he would have paid less for them.

11.     Plaintiff Alice Vitiello is a citizen of the State of Ohio, residing in Newbury Center, Ohio. For at least the last two years, Vitiello has purchased approximately two 52-ounce bottles of Fairlife's Chocolate 2% Reduced Fat Milk per week from her local grocery stores, including Target, Heinen's and Giant Eagle. Vitiello read and relied on Fairlife's statements regarding its humane treatment of its supply cows in choosing to purchase Fairlfe's milk products. Had Vitiello known of Fairlife's deceptive and misleading practices, she would not have bought Fairlife's products, or she would have paid less for them.

12.     Defendant Fairlife, LLC is a Delaware limited liability corporation with its principal place of business at 1001 W. Adams St., Chicago, Illinois 60607.

13.     On information and belief, Fairlife, LLC is a joint venture of The Coca Cola Company and Select Milk Producers, Inc., a New Mexico nonprofit marketing cooperative. Select Milk Producers, Inc. counts among its portfolio of companies Fair Oaks Farms, the farm whose conduct is at the center of this complaint. Fair Oaks Farms was the initial farm from which Fairlife's milk was produced and still makes up the public face of the milk supply from which Fairlife derives its products. The Coca Cola Company, in turn, distributes Fairlife's products.

## FACTUAL ALLEGATIONS

14.     In 2012, Fair Oaks Farms Brands, LLC was formed as a joint venture between The Coca Cola Company and Select Milk Producers, Inc to "create and innovative portfolio of

4

brands and products that feature the value-added nutrition of dairy."[4] Fairlife as a brand was launched from this venture in 2014, and the LLC was subsequently renamed Fairlife, LLC.

15.     Fairlife's branding as a responsible, humane producer of milk is not only reflected in its name, but also from the earliest marketing produced and disseminated by the company.  In April 2014, Fairlife stated, "We believe that great care for our cows results in great quality milk. Our cows have comfortable sand beds and freestanding stalls, allowing them to walk freely while being protected from harsh weather. We provide them with constant care and relaxation and they reward us with great milk. It's a win-win for everyone."

16.     At the same time, Fairlife was also launched as "the premiumisation of milk" according to Coca Cola's President of North America, Sandy Douglas, who stated that the new company would "rain money."[5]   Douglas further stated that Fairlife is "a milk that is premiumised and tastes better and we'll charge twice as much for it as the milk we're used to buying in a jug."[6]

17.     While Fairlife milk involves a "proprietary milk filtering process"[7] and markets itself as having less sugar and more protein than regular milk, a key part of this "premiumisation" of Fairlife also involves the perception that "[t]he milk is made on a sustainable dairy farm with 'fully sustainable high-care processes with the animals…'"[8]

---

[4] https://www.coca-colacompany.com/press-center/press-releases/the-coca-cola-company-and-select-milk-producers-inc-partner-to-create-fair-oaks-farms-brands-llc, last accessed June 6, 2019.

[5] https://www.businessinsider.com/coca-cola-is-launching-fairlife-milk-2014-11, last accessed June 6, 2019.

[6] *Id.*

[7] *Id.*

[8] *Id.*

18.     At all times since it was launched, Fairlife has devoted significant space on its website to advertising the kind and humane treatment Fairlife milk-producing cows are given. For example in April 2015, the Fairlife website prominently stated,

> "Our co-founder Mike McCloskey started his career as a cow veterinarian before turning to dairy farming, and under his care and guidance, we know that nothing is as important to us as the health and well-being of our animals. Our world revolves around making sure that our cows are fed well, treated humanely and live in comfortable, stress-free conditions.
>
> Newborn calves are visually monitored daily and are given immediate and proper medical treatment should they become ill.
>
> She [referring to the photo of a cow at the top of the web page] and her friends have comfortable beds and freestanding stalls, allowing them to walk freely while being protected from harsh weather. In the winter we keep wind and the elements out of their living areas by closing the curtained sidewalls of the barns. Cows love to stay cool, so in the warm summer months we use fans to maintain a 7 mph breeze over the feed manger and over the cows' beds. We also spray our cows' skin with water many times a day in order to keep their body temperature down.
>
> We spend a significant amount of time training all of our employees not only in proper animal husbandry but also indoctrinating them as to why we will accept nothing less than the utmost care, respect and humane treatment of our cows."[9]

19.     McCloskey is, of course, the same individual referenced in paragraph 4, *supra*, who accepted full responsibility for the treatment that systematically occurred at Fair Oaks Farms that forms the substance of this complaint.

20.     This website copy on Fairlife's website has remained largely unchanged since then until the present day.

21.     Beyond that, Fair Oaks Farms has been called "the Disneyland of agricultural tourism" and receives more than 600,000 paying visitors per year.[10]   Fair Oaks prominently

---

[9] http://web.archive.org/web/20150404163924/http://fairlife.com/our-farms/animal-care, last accessed June 6, 2019.
[10] https://www.indystar.com/story/news/crime/2019/06/05/fair-oaks-farm-indiana-abuse-video-coca-cola-arm/1349811001/, last accessed June 6, 2019.

states on its website that, "No one cares for the land, animals, and the safety and affordability of the food they produce as much as a farmer. Fair Oaks Farms is a place where our guests can have their questions or concerns answered with complete transparency, where they can make the connection between a farmer and the food on their tables."[11]

22.     On the same web page, Fair Oaks Farms prominently states that, "fairlife products made from Fair Oaks Farms milk, harness the simple goodness of nature's superfood to bring you nutritious real dairy beverages like never before. We continually push ourselves to keep improving our farming practices, leading the dairy industry in game-changing new practices and techniques that improve the wellbeing of the cows and land in our care."[12]

---

[11] https://fofarms.com/about-us/, last accessed June 6, 2019.
[12] *Id.*

23.     Further, all or substantially all of Fairlife's containers contain similar prominent messaging.  Large, 52 oz. bottles (a standard bottle size for Fairlife's products) contain the following statement (both whole milk and whole chocolate milk shown for example):



24.     Smaller 11.5-ounce single-serving bottles contain the following statement (a 2% reduced fat white milk bottle is shown for example):



25.     As stated *supra*, Fairlife sells its milk at a premium to other types of milk sold at retail.[13]  For example, a visit to a local Mariano's in Glenview, Illinois in June 2019 showed that a 52-ounce bottle of whole white milk retailed for $4.29, while a 64-ounce carton of Roundy's

---

[13] Many varieties of Fairlife are lactose-free, though Fairlife markets itself primarily as a competitor to regular milk rather than lactose-free milk.  Fairlife scarcely mentions its lactose-free nature on its website, stating instead that it "filters out natural sugars" from its milk products.

(store brand) lactose-free milk retailed for $3.49 and a 64-ounce carton of Lactaid retailed for $4.29. A 64-ounce bottle of Dean's Dairy Pure whole milk (also branded as a "premium" milk) retailed for $2.19 while a 64-ounce bottle of Roundy's whole milk retailed for $1.69.

26. On information and belief, Fair Oaks Farms is comprised of two separate farms under the same ownership: Fair Oaks Farms, which is a largely tourist-oriented farm with display cows, exhibits, and related food and rest facilities, and Prairies Edge Dairy Farms (previously named Fair Oaks Farms), the working farm, not open to the public, which produces the majority of milk which Fair Oaks Farms sells to Fairlife.

27. On June 4, 2019, Animal Recovery Mission released a video and the details of an investigation that took place at Fair Oaks Farms from August to November 2018 detailing systematic abuses at Fair Oaks' Prairie Edges North Farms.[14]

28. The Animal Recovery Mission report ("the Report") detailed systematic abuses its investigator observed, including the following:

> On a daily basis, Fair Oaks Farms employees were observed throwing calves in and out of their huts. Calves were pushed, thrown, slapped, kicked and slammed to the ground if and when the newborn calves did not nurse from the artificial rubber nipple during the feeding process. It was observed daily by the investigator that the calves were not taking to the bottle and would naturally prefer to nurse on the fingers of the workers. This naturally was more like the mother's utter. This led to frustrated employees. In turn many calves were either not given the right nutrition nor hydration to survive. Calves in the small enclosures were slowly dying and did die from this. Many calves were emaciated and had a body score of two to three, out of the nine point scale. It is to be noted that both workers and managers did recognize this. Workers, foremen and managers were observed joking with other employees as they sat on top of a calf. The newborn calf's legs buckled underneath her, not being able to bear the extra weight. The investigator also witnessed calves being stabbed and beaten with steel rebars, hit in the mouth and face with hard plastic milking bottles, beaten with steal branding irons, faces and bodies burned with hot branding irons, kneed in the middle of newborn

---

[14] *See* https://animalrecoverymission.org/wp-content/uploads/2019/06/Operation_Fair_Oaks_Farms_Dairy_Adventure.pdf at p. 2, last accessed June 6, 2019.

calves' backs with the full weight of a man's body. All of the following resulted in pain, suffering, permanent injury and death of the calves.[15]

. . .

The abuse to calves was not only evident at the Fair Oaks Farms' Prairies Edge North Barn. Employees often spoke about abuse taking place at a location referred to as Calfland and other sites controlled by Fair Oaks Farms. At Calfland, calves are raised for multiple Fair Oaks Farms properties before returning to their original dairy farms. Over ten thousand calves are housed, grown and neglected at this site.[16]

. . .

[T]he calves at Fair Oaks Farms receive no medical attention witnessed by the ARM Investigator and by the camera worn by the investigator. Calves can be seen struggling to breath and are observed suffering by themselves within their hutches. With temperatures reaching to as high as 110 degrees Fahrenheit in summer, dehydration and malnutrition are also possible factors leading to calves suffering and slowly dying at Fair Oaks Farms. Calves born with deformities are housed and grown as others are. Many not being able to walk, and painfully not being able to perform as others, are sold and transported to veal farms. The suffering of these calves is extreme. This is the decision of top management at Fair Oaks Farms. These calves should be humanely euthanized in the early days of their lives.[17]

Grown sick or injured cows were provided no treatment as well. If a cow was too sick to produce milk, employees were instructed to shoot the cow with a small caliber weapon. The caliber weapon used, does not cause the cows to be insensible to pain. Employees were not shooting the animals properly, which led to hours of pain and suffering before expiring from a gun shot to the head. Due to the many years Fair Oaks Farms has been in business, it is impossible to number the amount of calves and adult cows that have inhumanely died at the hands of the company. New born calves, male and female, are transported off property by trailer. The loading process for this transport is a very violent and dangerous experience for the animals. Fair Oaks Farms employees and supervisors are seen violently throwing calves into the trailer rather than placing them inside. On multiple occasions, calves are seen striking their heads while being thrown in and flipped over into the transport. They are packed so tight at times into the trailer, that they must be forcefully pushed in. It should also be noted that, Fair Oaks

---

[15] *Id.* at 3-4.

[16] *Id.* at 4.

[17] *Id.* at 4-5.

Farms Managers and the direct supervisors to the ARM Investigator, witnessed and took part in the inhumane handling during loading and unloading of calves.[18]

29.    While Fair Oaks and Prairies Edge do not supply all of the milk sold to Fairlife, Fair Oaks is the "flagship farm" of Fairlife and founder and co-owner of Fairlife Mike McCloskey is also the co-founder and co-owner of Fair Oaks Farms. Fair Oaks Farms, as stated *supra*, holds itself out as the public face of Fairlife's milk.

30.    As also stated *supra*, Fairlife, through McCloskey, has taken responsibility for the actions described in the Report. With the exception of unrelated allegations involving cannabis cultivation on the property, McCloskey does not deny the systematic abuse detailed in the report.

31.    McCloskey has stated that Fairlife is suspending milk deliveries from Prairies Edge and that it will "conduct independent third-party audits"[19] at its other supplying dairies – implying that it does not currently do so. In fact, the Chicago Sun-Times indicated that prior to the Report's publication, Fairlife only conducted one random audit per year across ALL its supplier dairies.[20]

32.    Further, while Fairlife states that it has already taken steps to address the illegal conduct laid out in the Report, it also does not deny that it was aware of the investigation several months prior to the release of the Report.[21] From the reporting of the *Chicago Tribune* on this matter, it would appear that Fairlife took no action or investigation on its own until the results of the investigation became public.

---

[18] *Id.* at 5.
[19] https://www.chicagotribune.com/business/ct-biz-fair-oaks-farms-alleged-animal-abuse-20190605-story.html, last accessed June 6, 2019.
[20] *See* https://chicago.suntimes.com/2019/6/10/18660484/fair-oaks-farms-animal-abuse-chicago-fairlife-milk-west-loop, last accessed June 11, 2019.
[21] *Id.*

33.     Facing boycotts from customers and negative press, Chicago-area supermarkets such as Jewel-Osco and Tony's Fresh Market have removed Fairlife's products from their shelves for an indeterminate period of time.[22]

34.     Customers of Fairlife such as Plaintiffs and the Class members rely on Fairlife's representations that it treats its animals not just humanely, but with "extraordinary animal care" (as stated *supra*).  However, Fairlife's standards have failed to meet even the minimum standards required of it by the State of Indiana in order to prevent neglect and abuse.[23]

35.     Consumers routinely demonstrate that they are willing to pay a premium for goods and foodstuffs that are grown in humane, sustainable ways.  Fairlife's products, as demonstrated, are sold at as much as a 100% markup over its competitors.  A measurable part of that cost reflects the expectation that Fairlife's products will come from humanely-treated cows.

36.     As a result, Fairlife has unfairly profited from its customers on the expectation that it treats its cows not just humanely, but in ease and comfort.

## CLASS ALLEGATIONS

37.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), on behalf of a Class defined as follows (sometimes referred to as the "Nationwide Class"):

> All persons in the United States and its territories who purchased, other than for resale, Fairlife products during the Class Period.

Excluded from the Class are: (i) Defendant and its officers and directors, agents, affiliates, subsidiaries, and authorized distributors and dealers; (ii) all Class members that timely

---

[22] *See* https://chicago.suntimes.com/2019/6/10/18660484/fair-oaks-farms-animal-abuse-chicago-fairlife-milk-west-loop, last accessed June 11, 2019/
[23] *See* https://chicago.suntimes.com/2019/6/10/18660350/3-charged-animal-cruelty-fair-oaks-farms-video-reports, last accessed June 11, 2019.

and validly request exclusion from the Class; and (iii) the Judge presiding over this action.

38.     Alternatively, Plaintiffs brings this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of the following subclasses:

> All persons in the State of Illinois who purchased, other than for resale, Fairlife products during the Class Period.

> All persons in the State of Ohio who purchased, other than for resale, Fairlife products during the Class Period.

Excluded from the subclasses are: (i) Defendant and its officers and directors, agents, affiliates, subsidiaries, and authorized distributors and dealers; (ii) all subclass members that timely and validly request exclusion from the subclass; and (iii) the Judge presiding over this action.  The claims do not include personal injury claims.  The subclasses are sometimes referred to as the Illinois Subclass and the Ohio Subclass.  The Nationwide Class and the Illinois and Ohio Subclasses are sometimes collectively referred to as the "Class".

39.     Certification of Plaintiffs' claims for class-wide treatment are appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

40.     The members of the Class are so numerous that joinder of the Class members would be impracticable.

41.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

> A.      Whether Defendant engaged in the conduct alleged;

> B.      Whether Defendant misrepresented its products as humanely produced;

> C.      Whether Plaintiffs and the Class members paid for a product that they did not receive;

D.    Whether Plaintiffs and the Class members have been damaged and, if so, the measure of such damages;

E.    Whether Defendant unjustly retained a benefit conferred by Plaintiffs and the Class members; and

F.    Whether Plaintiffs and the Class members are entitled to equitable relief, including, but not limited to, a constructive trust, restitution, and injunctive relief.

42.    Plaintiffs' claims are typical of the claims of the Class members because, among other things, Plaintiffs and the Class members were injured through the substantially uniform misconduct described above.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class members.

43.    Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent; they have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel.

44.    A class action is also warranted under Fed. R. Civ. P. 23(b)(2), because Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.  Defendant has directed and continues to direct its conduct to all consumers in a uniform manner.  Therefore, injunctive relief on a class-wide basis is necessary to remedy continuing harms to Plaintiff and the Class members caused by Defendant's continuing misconduct.

45.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other detriment suffered by Plaintiffs and the

Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct.  Even if Class members could afford individual litigation, the court system should not be required to undertake such an unnecessary burden.  Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Unjust Enrichment**
**(By All Plaintiffs on Behalf of the Nationwide Class)**

46.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 44 as if fully set forth herein.

47.     Plaintiffs bring this claim individually and on behalf of the members of the Class.

48.     Defendant has been unjustly enriched to Plaintiffs' and the Class members' detriment as a result of its unlawful and wrongful retention of money conferred by Plaintiffs and the Class members who relied on Defendant's representations regarding the treatment of its supply cows and paid a premium price for Defendant's products as a result.

49.     Defendant's unlawful and wrongful acts, including misrepresenting the nature of its treatment of supply cows, enabled Defendant to unlawfully receive monies it would not have otherwise obtained.

16

50. Plaintiffs and the Class members have conferred benefits on Defendant, which Defendant has knowingly accepted and retained.

51. Defendant's retention of the benefits conferred by Plaintiff and the Class members would be against fundamental principles of justice, equity, and good conscience.

52. Plaintiffs and the Class members seek to disgorge Defendant's unlawfully retained profits and other benefits resulting from its unlawful conduct, and seek restitution and rescission for the benefit of Plaintiff and the Class members.

53. Plaintiffs and the Class members are entitled to the imposition of a constructive trust upon Defendant, such that its unjustly retained profits and other benefits are distributed equitably by the Court to and for the benefit of Plaintiff and the Class members.

**SECOND CLAIM FOR RELIEF**
**Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1, et seq.**
**(By Plaintiff Andrew Schwartz on Behalf of the Illinois Subclass)**

54. Plaintiff Schwartz repeats and realleges the allegations set forth in paragraphs 1 through 44 as if fully set forth herein.

55. This cause of action is brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. ("ICFA").

56. The express purpose of the ICFA is to "protect consumers" "against fraud, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…." 815 ILCS 505/1.

57. Plaintiff Schwartz and the Illinois Subclass members are "consumers" within the meaning of 815 ILCS 505/1(e).

58. Defendant was engaged in "trade or commerce" as defined by 815 ILCS 505/1(f).

59. 815 ILCS 505/2 declares unlawful "unfair methods of competition and unfair or

deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omissions of such material fact … in the conduct of any trade or commerce."

60.     Defendant's unfair and deceptive practices, in that it represented that its supply cows were humanely treated and that supply cow welfare and comfort was a major consideration in production of Defendant's products, are likely to mislead – and have misled – the consumer acting reasonably in the circumstances, and violate 815 ILCS 505/2.  This includes misleading Plaintiff Schwartz and the Illinois Subclass.

61.     Defendant has violated the ICFA by engaging in the unfair and deceptive practices as described herein, which practices offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers.

62.     Plaintiff Schwartz and members of the Illinois Subclass have been aggrieved by Defendant's unfair and deceptive practices in that they purchased Defendant's products, which they would not have purchased or would not have paid as much for had they known the true facts.

63.     The damages suffered by Plaintiff Schwartz and the Illinois Subclass were directly and proximately caused by the deceptive, misleading and unfair practices of Defendant, as more fully described herein.

64.     Pursuant to 815 ILCS 505/10(a), Plaintiff Schwartz and the Illinois Subclass make claims for economic damages, punitive damages, and attorneys' fees and costs.

65.     Pursuant to 815 ILCS 505/10(d), a copy of this complaint has been mailed to the Illinois Attorney General concurrent with its filing.

**THIRD CLAIM FOR RELIEF**
**The Ohio Consumer Sales Practices Act**
**Ohio Rev. Code Ann. § 1345.01 *et seq.***
**(By Plaintiff Alice Vitiello Individually and on Behalf of the Ohio Subclass)**

66.     Plaintiff Vitiello repeats and realleges the allegations set forth in paragraphs 1 through 43 as if fully set forth herein.

67.     This claim is brought by Plaintiff Vitiello on behalf of Ohio purchasers of Fairlife products who are members of the Ohio Subclass.

68.     Ohio Consumer Sales Practices Act (OCSPA), Ohio Rev. Code Ann. § 1345.01 *et seq.*, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the OCSPA prohibits a supplier from representing, inter alia: "[t] hat the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;" or is ". . .of a particular standard, quality, grade, style, prescription, or model, if it is not." Ohio Rev. Code Ann. § 1345.02(B)(1-2).

69.     Fairlife is a "supplier" as that term is defined in Ohio Rev. Code Ann. § 1345.01(C).

70.     Plaintiff Vitiello and Ohio Subclass Members are "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D), and their purchase or lease of Fairlife's products is a "consumer transaction" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

71.     In the course of business, Defendant misrepresented the nature of its products by affirming that its supply cows were treated humanely and with close attention to their welfare and comfort when they were not.  The misrepresentations to Plaintiff Vitiello and the other Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase Fairlife's products. Had Plaintiff Vitiello and

the other Subclass Members known of true nature of Fairlife's and its suppliers' business practices, they would not have purchased its products.

72.     The acts of Fairlife constitute "[u]nconscionable consumer sales acts or practices as defined in Ohio Revised Code 1345.03.

73.     As a result of the foregoing wrongful conduct, Plaintiff Vitiello has been damaged in an amount to be proven at trial and seeks all just and proper remedies, including but not limited to actual economic damages and reasonable attorney's fees. Ohio Rev. Code. Ann. § 1345.09(E)(F).

74.     Based on the foregoing, Plaintiff Vitiello and the Ohio Subclass have been injured in an amount to be determined at trial

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A.     Certifying the Class under Federal Rule of Civil Procedure 23, as requested herein;

B.     Appointing Plaintiffs as Class Representatives and Plaintiff's Counsel as Class Counsel;

C.     Awarding Plaintiffs and the Class members damages and/or equitable relief as appropriate;

D.     Awarding Plaintiffs and the Class members declaratory and injunctive relief;

E.     Awarding Plaintiffs and the Class members restitution and disgorgement;

F.     Imposing a constructive trust for the benefit of Plaintiffs and the Class members on the unjustly retained benefits conferred by Plaintiffs and the Class members upon Defendant;

G.    Awarding Plaintiffs and the Class members reasonable attorneys' fees, costs, and expenses; and

H.    Granting such other relief as the Court deems just and appropriate.

**JURY TRIAL DEMAND**

Plaintiffs, individually and on behalf of all others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on all claims so triable.


DATED: June 12, 2019                          by: *s/ Carl V. Malmstrom*
                                              **WOLF HALDENSTEIN ADLER**
                                              **  FREEMAN & HERZ LLC**
                                              Carl V. Malmstrom
                                              111 W. Jackson St., Suite 1700
                                              Chicago, Illinois 60604
                                              Tel.: (312) 984-0000
                                              Fax: (212) 686-0114
                                              malmstrom@whafh.com

                                              **WOLF HALDENSTEIN ADLER**
                                              **  FREEMAN & HERZ LLP**
                                              Jeffrey G. Smith
                                              Matthew M. Guiney
                                              270 Madison Avenue
                                              New York, New York 10016
                                              Tel.: (212) 545-4600
                                              Fax: (212) 686-0114
                                              smith@whafh.com
                                              guiney@whafh.com

                                              *Counsel for Plaintiff and the Proposed*
                                              *Class*

whafh804873